## Frost v. Commonwealth.

(Decided May 31, 1935.)

A. J. OLIVER for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MUR-PHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the trial in the Allen circuit court of an indictment accusing him of murderng Tom Hughes, the appellant and defendant below, Harve Frost, was convicted of voluntary manslaughter and punished by imprisonment in the penitentiary for two years, being the minimum for that offense. After his motion for a new trial was overruled, he prosecuted this appeal in which his counsel argues a number of alleged errors for a reversal of the judgment, some of which are not relied on in the motion for a new trial, and one of which is manifested only in the motion (i. e., improper argument of prosecuting counsel). It nowhere appears in the record by a bill of exceptions or other method permitting us to consider it, and in the motion for a new trial it is only said that "the court erred in permitting attorneys for the commonwealth to argue things highly prejudicial to defendant," etc., there being no statement therein as to what the alleged prejudcial argument contained. In the circumstances, that ground is not available on the hearing of this appeal. As stated in brief, the only place in the record where it appears, it consisted only of prosecuting counsel taking in his hands and exhibiting to the jury the pistol with which the killing was done, as well as a large pocket knife that figured in the melee, and as so depicted in brief it cannot be magnified into a prejudicial error.

Another complaint contained in the motion for a new trial is, that the court "failed to properly instruct the jury"; but if that ground was meritorious we could not consider it, since the instructions were not certified

by any bill of exceptions or order of the court whereby they become properly identified as the ones given or refused by the court. The only certification of anything by the presiding judge of what occurred at the trial is his approval of the official stenographer's transcript of the evidence, which does not contain the instructions to the jury, and there is no bill of exceptions in the case, except the transcript of the evidence. However, what counsel insists were the instructions given by the court are copied by the clerk but with no proper certification as to their verity, and if we should accept counsel's statement in his brief that such copies were the ones given by the court to the jury, then no error in them appears and counsel failed to point out any. It is, therefore, manifest that this argument of counsel is unavailing.

It is also complained in the motion for a new trial, and which is only briefly referred to by counsel, that the court erred in admitting and refusing evidence. But few exceptions to testimony appear in the bill of evidence, and when the court sustained any of the very few objections that the commonwealth interposed to testimony offered by defendant, no avowal was made of the answer that defendant's witness would make. Besides, the matters involved in such complaints, in most of the instances, were later corrected as the trial progressed and during which the facts were developed, and for which reason alone it is impossible for us to see wherein defendant's rights were prejudiced. But an equally potent and conclusive reason why such complaints should not be allowed is that the matters involved were clearly immaterial and could in no wise affect either the prosecution or the defense the one way or the other.

We are, therefore, brought to a consideration of the chief grounds argued by counsel and the only ones, as we view the record, that counsel could plausibly contend for, and which are: (1) That the evidence is insufficient to sustain the verdict and a peremptory acquittal should have been directed; but, if mistaken in that, then (2) that the verdict is flagrantly against the evidence; each of which will be disposed of together, and since they involve the testimony heard at the trial it will be necessary to make a substantial statement of its effect.

The killing occurred in the early afternoon of December 9, 1933, in the front yard to the residence of Nath Loyd on the Jackson Highway running from Scottsville into the state of Tennessee and on to Gallatin and other cities therein. Em Hughes and the deceased, Tom Hughes, were brothers, while appellant and Em Hughes were brothers-in-law, having married daughters of Nath Loyd; but Em Hughes and his wife were separated and not living together at the time. All of the parties resided in the same general neighborhood, and on the fatal day Em Hughes, the deceased, and some of the boys of the former began stripping tobacco in a barn not far from the residence of Mr. Loyd. Later in the forenoon appellant and Loyd appeared at the barn, and, perhaps, each of them engaged in the stripping for a short while, but Loyd soon left and went to his residence later returning with some moonshine liquor and a pistol. Appellant and one of the sons of Em Hughes undertook to haul some wood to the barn, presumptively for fuel in maintaining a fire for the comfort of the strippers. Near the noon hour the parties left the barn and went to the Loyd residence for some purpose not disclosed; but before arriving there they had determined to take the noon lunch at the residence of Em Hughes, since the members of the family of Mr. Loyd were away. While tarrying there, and very shortly after they had arrived, some parties passed on the road in front of the residence, which is about 75 or 100 yards from it, and one of them called for Mr. Loyd for the purpose of arranging with him about delivering some corn that he had bought from the caller. About the time he started to the road in response to that call another one of the parties at the road called Tom Hughes, and he went along.

Directly after the two got to the road, Mr. Loyd, who seems to have become considerably intoxicated, drew a bottle from his pocket and offered a drink to the one who had called him, but which was refused. Tom Hughes then took the bottle and remarked that its contents were "no account," and then put the bottle in his pocket, which enraged Loyd and he drew his pistol and demanded a return of the bottle to him, which was done, but he appears to have continued to be enraged and finally shot at Tom Hughes twice. Those shots attracted the attention of Em Hughes and appellant, who

had remained on the front porch of the Loyd residence. They immediately went to the scene of the difficulty between Mr. Loyd and Tom Hughes, which both of them said was for the purpose of quelling that disturbance. In the meantime, Tom Hughes had struck Loyd with a rock, and perhaps also with his fist, but which did not render him hors de combat, and he continued to make demonstrations to shoot the deceased, Tom Hughes, and was so engaged about the time appellant and Em Hughes arrived when the latter undertook to take the pistol away from Mr. Loyd and in doing so inflicted upon him some additional wounds with rocks and with his fist, until he obtained the pistol, when Loyd drew a large knife and continued to demonstrate his willingness to wage battle.

Up to this point there is but little contradiction in the testimony, but from thence forward there is a direct conflict. When Em Hughes succeeded in wresting the pistol from Loyd he put it in the pocket of a jacket that deceased was wearing, and he testified (and in which he was at least to some extent corroborated by other parties who were traveling upon the highway) that he and his brother, Tom, took charge of Mr. Loyd and started with him to the house, and when near the porch appellant took the pistol from the jacket pocket of deceased and hit him with it by the side of the head, producing a bleeding wound. According to the testimony of Em Hughes, his brother Tom then undertook to take the pistol from appellant and to resist the assault that the latter had made upon him, as well as to defend himself from what appeared to be a determination on the part of appellant to kill him with the pistol. They thereupon engaged in a scuffle during which some shots were fired when appellant jerked loose from deceased and fired the fatal shot, there being two of them but only one taking effect, and which made four shots in all fired by appellant from the time he and Tom Hughes began the affray and the firing of the fatal shot.

Appellant insists and so testified that the two Hughes were about to kill Mr. Loyd near the road when he appeared at that spot and participated to some extent in it, all of which, as he claims, was done in defense of Loyd; and that after that melee was temporarily subsided he (and not the two Hughes) started to take Mr. Loyd to his house and while doing so he was over-

taken en route by Tom Hughes, who first struck him on the side of the head with the pistol, and which precipitated his fatal conflict with deceased. A greater number of disinterested witnesses who saw portions of the difficulty corroborated the testimony of Em Hughes, as so outlined, than was done by other similar witnesses who corroborated defendant in his version of what occurred near the porch of the Loyd residence where the deceased was shot.

After the shooting the two Hughes repaired to a neighborhood roadhouse and went from thence to the home of their mother where the deceased lived and where he died about twenty-four hours thereafter, during which time he gave a dying declaration, after his physician had told him that he could not live, and in which he corroborates the testimony of his brother on most salient points of his testimony. We have refrained from going into detail and narrating the testimony of each witness, since we conclude that it is entirely unnecessary to the proper disposition of the case, and likewise it would be of no service to the members of the profession nor to any other individual. We have accurately outlined the substance of the testimony and stated its general effect, which we think is sufficient, not only for an understanding of the case, but also for its correct disposition.

It will be seen that the testimony as a whole is considerably contradictory as to the one upon whom the blame should rest for the killing of Tom Hughes. One fact, however, is outstanding, and which is, that Loyd was inexcusably belligerent on that occasion and if appellant's first entry into the affray was for the purpose of defending Loyd it is doubtful if he could justify any of the consequences, if Loyd could not do so if he had been the perpetrator. But, waiving that question, the utmost that may be said is, that the conflict in the testimony was such as to not only authorize a submission of the case to the jury, but also to sustain the verdict of guilty that it returned. It is Hornbook law that it is the exclusive province of the jury to reconcile such conflicts in testimony, and it is only where the verdict is flagrantly against the testimony as a whole that courts will interfere to set it aside as flagrantly against the evidence. Also, that it is only when the testimony as a whole furnishes no reasonable probability of defend-

ant's guilt that a peremptory instruction of acquittal is authorized. There are some facts in this case strongly supporting defendant's theory that he shot Tom Hughes in the exercise of his right of self-defense; but such circumstances are counterbalanced by others strongly indicating that appellant became supremely angry at the two Hughes over what he considered their unjustifiable assault on his father-in-law, Mr. Loyd, and that his anger, so engendered, continued until long after the shooting, since he immediately departed from the scene with the pistol with which he had done the shooting and began a search of the neighborhood for cartridges to reload it, and which was after the Hughes had departed, although appellant stated that Em Hughes said, when the brothers took their departure, that he would return. and "kill the whole bunch."

Under the well-settled rules, supra, measuring our duties, as well as our authority in cases like this, we are unable to agree with counsel that the verdict is flagrantly against the evidence, much less that his client was entitled to a directed verdict of acquittal.

Wherefore, the judgment is affirmed.